**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

**BOARD OF EDUCATION OF THE MAMARONECK**          **ECF CASE**
**UNION FREE SCHOOL DISTRICT,**

                         **Plaintiff,**                          **Civil Action No.**


                         **-against-**

                                                    **COMPLAINT**

**D.B AND AN.S., INDIVIDUALLY AND ON BEHALF**
**OF A.B., A MINOR,**
                         **Defendants.**

_____

Plaintiff, BOARD OF EDUCATION OF THE MAMARONECK UNION FREE SCHOOL DISTRICT ("District"), by its attorneys, Shaw, Perelson, May & Lambert, LLP, as and for its Complaint, states:

1. This action is commenced pursuant to the Individuals with Disabilities in Education Improvement Act ("IDEIA"), 20 U.S.C. §§ 1400 *et seq.*, to challenge a portion of a May 20, 2021 Decision of the State Review Officer of the State Education Department of the State of New York (hereinafter "SRO"), in Case No. 21-091, which found that student A.B.'s placement in a BOCES Intensive Day Treatment ("IDT") program constituted a disciplinary change of placement of A.B. in an Interim Alternative Educational Setting ("IAES") in accordance with 8 NYCRR 201.2(k) without the District initiating a hearing in accordance with 8 NYCRR 201.8(a) and (c) and ordered that the District provide student A.B. with 37 hours of compensatory instructional hours provided by either a special education teacher or a Board Certified Behavior Analyst ("BCBA").

2. This Court has jurisdiction over this action and over the defendants pursuant to 20 U.S.C. §§ 1415 (i)(1)(B) and 1415(i)(2)(A).

3. Venue in the United States District Court for the Southern District of New York is proper under 20 U.S.C. § 1415(i)(2)(A).

## THE PARTIES

4. Plaintiff is the Board of Education of a school district, a corporate body duly organized and existing under New York Education Law § 1601, with offices at 1000 West Boston Post Road, Mamaroneck, New York 10543, and is a local educational agency as defined by the IDEIA, 20 U.S.C. § 1401(15), and is thereby required, pursuant to 20 U.S.C.§ 1414(d)(2), to develop an individualized educational program ("IEP") annually for each resident student it has identified as having a classifiable disability.

5. Defendant A.B. is a student with average cognitive ability and commensurate academic functioning, who was referred to the District's Committee on Special Education ("CSE") in the Fall of his Kindergarten school year based largely upon behavioral concerns.

6. On November 30, 2017, upon considering a comprehensive set of evaluations, the District's CSE classified A.B. as a student with an Emotional Disturbance under the IDEA, and an IEP was then developed for the balance of the 2017-2018 school year calling for A.B.'s placement in an Integrated Co-Teaching ("ICT") class with additional supports to address his social-emotional needs (SD-2).[1]

7. Upon information and belief, A.B. resides with Defendant parent An.S. and is or was a resident student in the District.

8. Defendants D.B. and An.S. (hereinafter jointly referred to as the "Parents") are the parents and legal guardians of defendant A.B.

---

[1] For ease in the Defendants preparing an answer to this Complaint and for the Court's convenience, references to the administrative record below are identified by hearing transcript references ("T:"), District exhibits ("SD-") and Parent exhibits ("PE-").

**THE FACTS**

9.      A.B. completed his Kindergarten year in the program that the CSE developed on November 30, 2017 and was reported to have been benefitting from the special education supports that had been put into place (T: 153-154).

10.     On March 28, 2018, the CSE met for the purpose of conducting an annual review and developing A.B.'s IEP for the 2018-2019 school year (SD-4). At this meeting, it was reported that A.B. had met academic Kindergarten benchmarks and that his overall ability to participate in classroom activities had increased (T: 327).

11.     At the March 28, 2018 CSE meeting, A.B.'s co-teachers provided detailed information, both orally and in writing, regarding his academic, social/emotional, physical and behavioral functioning (SD-21), including that, although A.B.'s problematic behaviors were reported to have decreased since he entered the ICT classroom in December (SD-4-7; T: 208), A.B. was continuing to present with behavioral challenges (T: 323) and A.B. was a potential elopement risk during transitions (SD-4-2; T: 139; T: 327).

12.     At the March 28, 2018 CSE meeting, A.B. was reported to have been benefitting from participation in the social skills group (SD-4-7), and both parents reported seeing an increase in A.B.'s self-awareness and other improvements in his behavior since starting the ICT program (SD-4-2).

13.     Upon considering all of the information presented at the March 28, 2018 CSE meeting, the CSE developed six goals for A.B., focusing upon his complying with teacher directions and classroom rules, transitioning from more preferred to less preferred activities and appropriate communications (SD-4-9).

14.      At the March 28, 2018 CSE meeting, the CSE strengthened the program that had been put

into place for A.B. in December, increasing the daily ICT time from three hours to four hours (T: 139-142; T: 329), adding a behavioral consultation for six hours per year with the District-wide behavioral specialist (T: 142-144), parent counseling and training four hours per year (T: 144-145; T: 331) and, to ensure that A.B. was safe during transitions, a full-time 1-1 paraprofessional (SD-4-2; T: 145-146).

15. At the March 28, 2018 CSE meeting, in addition to the program modifications that had been put in place in December, the CSE established clearly stated expectations and limit-setting, a home/school communication system (SD-4-8), positive behavioral supports, the provision of structure and predictable routines and adaptive physical education (SD-411-12).

16. Following the March 28, 2018 CSE meeting, A.B.'s Behavior Intervention Plan was updated (SD-22).

17. A.B. started well in his 2018-2019 first grade program and reportedly had a "seamless transition" (T: 973), but a familiar pattern developed toward the end of September, revealing that A.B. had the ability to perform academic tasks but continued to present with behavioral struggles (SD-7-4; SD-23; SD-44; T: 340-341; T: 973-977).  Nonetheless, District staff continued to work diligently to address such behaviors so as to maintain A.B.'s placement in the least restrictive environment

18. The CSE met on March 27, 2019 to review A.B.'s progress and to plan for his second grade school year (SD-7), during which meeting it was reported that, although there were still no academic concerns and his teacher reported that he continued to be on grade level academically (T: 990), there were continuing low frequency, high intensity behavioral concerns regarding A.B. (T: 157-158) and it was reported that, notwithstanding the Parent's

position that A.B.'s behavior "had improved somewhat this year" (SD-24-2), "behavioral triggers remain a challenge to identify despite consistency of structures and approach used within the school environment" (SD-7-1).

19. In response to the information provided during the March 27, 2019 CSE meeting, the CSE developed six goals focusing upon not only assisting A.B. in work completion, but also enabling him to identify his emotions, engage in cooperative play skills in a non-preferred activity, transitioning, complying with teacher directives and using learned coping skills to maintain acceptable school behavior (SD-7-9).

20. In addition to the special education programs and supports that had been on A.B.'s first grade IEP, in A.B.'s second grade IEP, the CSE added an extraordinary support in the form of a psychological consultation for four hours per week, during which time the school psychologist would work with both A.B. and staff on behavior management and emotional regulation (SD-7-12).

21. Following the March 27, 2019 CSE meeting, A.B. began to present with significantly more aggressive behaviors (T: 342) and, after conducting an updated psychiatric evaluation, the CSE met again on May 31, 2019 and recommended that a search be conducted for an out-of-District placement of A.B. in an approved therapeutic day program for A.B.'s second grade school year (SD-8-1-2).

22. The CSE met again on July 31, 2019 to review the status of the search for an out-of-District placement of A.B. in an approved therapeutic day program (SD-9; T: 164).

23. At the July 31, 2019 CSE meeting, A.B.'s mother, An.S., reported that A.B.'s behaviors had improved based upon a number of factors – including that A.B. was now taking medications (T: 355), that A.B. had not engaged in problematic behaviors at the private

summer program in which he had been enrolled and that A.B. was going to be receiving private therapy – and made a plea that A.B. be given another chance in the ICT program at the Mamaroneck Avenue School (T: 165).

24. At the July 31, 2019 CSE meeting, the CSE agreed to honor An.S.'s request and restored the program recommendations for A.B. that had been made at the March 27, 2019 CSE meeting (T: 166), but warned that, if A.B.'s behaviors returned to what they had been in first grade, the CSE would need to revisit the issue of whether A.B. required a more restrictive placement.

25. Upon his return to the ICT class at the Mamaroneck Avenue School in September, 2019, A.B. immediately engaged in behaviors of physical aggression, including hitting, kicking, biting and elopement, for which he was suspended a total of 7.5 days (T: 449, 756-757, 765; SD-32; SD-34; SD-56; SRO Decision at p. 40).

26. The CSE thereupon met on September 27, 2019 to review A.B.'s current placement and recommended four hours of home instruction per day pending a search for an out-of-District therapeutic day program for A.B. (SD-10-1; T: 1019) (SRO Decision at p. 40).

27. At the September 27, 2019 CSE meeting, there was discussion that the Parents could elect to have A.B. attend an Intensive Day Treatment ("IDT") placement in lieu of the recommended four hours of home instruction per day, but that this placement would be a general education program that the Parents could voluntarily elect outside of the CSE process. A.B.'s Parent selected the IDT program.

28. An IDT intake was conducted on September 27, 2019 (SD-55-1), which resulted in A.B. being accepted into the IDT program and starting in that program on October 4, 2019 (SD-55-3).

29. On October 8, 2019, the District initiated a due process hearing in response to the Parent's request for multiple independent educational evaluations.

30. On October 15, 2019, A.B.'s parent, An.S., initiated a due process hearing in which, inter alia, she invoked A.B.'s "pendency" placement in the ICT class at the Mamaroneck Avenue School.

31. On October 21, 2019, the District initiated an impartial hearing in accordance with 8 NYCRR 201.8 to demonstrate that returning A.B. to the ICT class at the Mamaroneck Avenue School was likely to lead to injuries to A.B. or to others.

32. All three of the due process hearings that had been initiated involving A.B. were consolidated before the same Impartial Hearing Officer ("IHO") (T: 39).

33. Counsel for the District and counsel for the Parents thereafter engaged in discussions regarding the pendency request contained in the Parent's October 15, 2019 due process request and the District's October 21, 2019 due process complaint brought in accordance with 8 NYCRR 201.8, resulting in an agreement between the parties that the Parents would accept the IDT placement and the District would withdraw its 8 NYCRR 201.8 due process hearing request; that agreement was communicated to the IHO and the hearing proceeded before the IHO based upon the issues contained in the initial October 8, 2019 due process complaint filed by the District and the October 21, 2019 due process complaint filed by the Parents.

34. A.B. remained in the agreed-upon IDT placement until he was placed in a BOCES therapeutic day program, the appropriateness of which was not challenged by the Defendants, effective November 27, 2019.

35. Upon A.B.'s placement in the BOCES therapeutic day program, the District withdrew its

request that A.B. be placed in an Interim Alternative Educational Setting for 45 school days.

36.   A.B.'s placement in the IDT program did not constitute a disciplinary change in placement of a student with a disability (20 U.S.C. § 1415[k]; Education Law §§ 3214[3][g]; 4404[1] [4][b]; 34 CFR 300.530; 8 NYCRR Part 201); it not only was not "disciplinary," but was, in fact, agreed to by the Parents as an alternative to the CSE-recommended program of home instruction.

37.   The IDT program was not an "Interim Alternative Educational Setting" within the meaning of 8 NYCRR 201.2(k).  It was not a program recommended by the CSE and was not disciplinary in nature, but was, instead, a general education program selected for A.B. by A.B.'s Parent that had been offered by the District to the Parents in lieu of the CSE-recommended four hours of home instruction per day until A.B. could be placed in an out-of-District therapeutic day program.

38.   In a decision dated March 10, 2021, the IHO determined that the District offered A.B. a free appropriate public education ("FAPE") for the 2017-18, 2018-19 and 2019-20 school years and denied the Parents' requested relief (IHO Decision at pages 44-46).

39.   In response to the Parents' claim regarding A.B.'s discipline for the 2019-20 school year, the IHO held that A.B. was not suspended for ten days, and a manifestation determination review ("MDR") was not required as the removals of A.B. were not disciplinary, but for safety reasons, that A.B.'s placement in the IDT program was also not disciplinary and that A.B. had been placed in that program only while awaiting placement in a therapeutic day treatment program (IHO Decision at pages 38-40; SRO Decision at page 8).

40.    In a decision rendered on May 20, 2021, in Decision No. 21-091, the SRO held that:

> Here, the IDT met the definition of an IAES (8 NYCRR 201.2[k]) and the district was required to seek an IHO determination if it was of the view that maintaining the student's placement in the program and placement he attended prior to the September 2019 CSE meeting was likely to result in injury to the student or to others (see 8 NYCRR 20 I .8[a], [c]). Had such a decision been obtained, the district would thereafter have been required to conduct an MDR (see 8 NYCRR 201.4[a][2]). The district may not unilaterally remove a student with a disability from his placement because it believes the student poses a safety risk (see Honig v. Doe, 484 U.S. 305, 321 [1988] [noting "Congress' unquestioned desire to wrest from school officials their former unilateral authority to determine the placement of emotionally disturbed children."]; Patrick v. Success Academy Charter Schs., Inc., 354 F Supp 3d 185, 232-33 & n.57 [E.D.N.Y. 2018] (observing that "in some circumstances, a school could be required to allow a disabled student who did not inflict 'serious bodily injury,' but is a 'continuing danger,' to return to school, or else risk being held liable under the IDEA for improperly keeping the student out of school"]).

> Having not followed the procedures for obtaining the student's placement in an IAES, the CSE also did not formally recommend the IDT program on the student's IEP, noting only in meeting comments that it was an alternative; instead, the CSE recommended home instruction (see Dist. Ex. 10 at pp. 1-2, 13). Accordingly, the district cannot defend the student's placement in the IDT as an IEAS or as an offer of a FAPE, and the IHO erred in finding that the district's placement of the student in the IDT was procedurally or substantively appropriate.

## AS AND FOR A FIRST CLAIM FOR RELIEF

41.    The District repeats and realleges the allegations set forth at paragraphs numbered 1 through 40 of the Complaint as if fully set forth herein.

42.    The IHO Decision as concerned the District's agreeing to the Parents' decision to place A.B. in the IDT program pending A.B.'s placement in an out-of-District therapeutic day program, rather than having A.B.'s interim program being four hours of daily home instruction, not depriving A.B. of a FAPE was supported by the preponderance of the evidence in the record before the IHO.

43.    The SRO's finding that A.B. was improperly removed to the IDT program and her resulting

award of 37 hours of compensatory education services is both contrary to the preponderance of the evidence presented in the record of the administrative proceedings and contrary to the law.

44. The Court should, in the exercise of its equitable powers, deny enforcement of so much of the decision of the SRO that held that A.B. was improperly removed to the IDT program and her award of 37 hours of compensatory education services based upon that holding.

45. The Court should reverse, vacate or annul so much of the decision of the SRO that held that A.B. was improperly removed to the IDT program and her award of 37 hours of compensatory education services based upon that holding.

**WHEREFORE**, the plaintiff Mamaroneck Union Free School District requests that the Court conduct a review, as necessary, of the administrative record in this action and such additional evidence as the parties may be permitted to introduce and render an Order vacating, reversing or annulling so much of the decision of the SRO that held that A.B. was improperly removed to the IDT program and her award of 37 hours of compensatory education services based upon that holding and granting said Plaintiff such other and further relief as the Court may deem just and proper.

Dated: September 8, 2021

SHAW, PERELSON, MAY & LAMBERT, LLP
Attorneys for the plaintiff Mamaroneck UFSD

By: _____**/S/**_____

Mark C. Rushfield, Esq. (MCR0231)
Of Counsel to the Firm
21 Van Wagner Road
Poughkeepsie, N.Y. 12603
845/486-4200
mrushfield@shawperelson.com