UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BOARD OF EDUCATION OF THE
MAMARONECK UNION FREE SCHOOL
DISTRICT,

                            Plaintiff,

    -against-

D.B. AND AN.S., individually and on behalf of
A.B., a minor,

                          Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 03/31/2024

No. 21 Civ. 7596 (NSR)
**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge:

       Plaintiff Board of Education of the Mamaroneck Union Free School District's ("Plaintiff"

or "the District") commenced this action against D.B. and An.S., both individually and on behalf

of A.B., a minor, (collectively, "Defendants") pursuant to the Individuals with Disabilities in

Education Improvement Act (the "IDEA" or "IDEIA"), 20 U.S.C. §§ 1400 *et seq*. The District

seeks judicial review of the New York Department of Education State Review Officer's ("SRO")

decision (the "SRO Decision") that reversed in part a previous decision (the "IHO Decision") of

an Impartial Hearing Officer ("IHO"). The SRO found that A.B.'s placement in an "intensive

day treatment" ("IDT") program constituted an "interim alternative educational setting"

("IAES"), which required the District to seek an IHO hearing to determine whether A.B.'s prior

placement was likely to result in injury to A.B. or other students. The SRO further found that the

District was required, and failed, to conduct a manifest determination review ("MDR"). Finally,

the SRO awarded A.B. compensatory education as a remedy.

       Before the Court is Plaintiff's motion for summary judgment. (ECF No. 20). For the

reasons set forth below, Plaintiff's motion is GRANTED in its entirety and the SRO's decision

with respect to IDT amounting to a IAES, and the consequent award of thirty-seven hours of compensatory education, is REVERSED.

## BACKGROUND

### I.     Factual Background

The parties have submitted briefs, statements of material facts pursuant to Local Civil Rule 56.1,[1] and the record and exhibits from the proceedings below, which reflect the following factual background.[2]

#### a.   A.B.'s Time in the District and IDT Program

A.B. was a student at the Mamaroneck Avenue School ("MAS") in the 2019 school year placed in an integrated co-teaching ("ICT") setting. (Pl. 56.1 ¶ 35). From the outset, A.B. engaged in physically aggressive behavior and elopement, resulting in his suspension for a total of seven-and-one-half days between September 6 and October 1, 2019. (*Id*. ¶¶ 35-36). On September 27, 2019, the District's Committee on Special Education ("CSE") met to review A.B.'s current placement. (*Id*. ¶ 38).

The CSE recommended A.B. receive four hours of home education pending a search for an out-of-District therapeutic day program. (*Id*.) An.S. rejected the CSE's recommendation of home education. (*Id*. ¶ 1). Nevertheless, as of September 27, 2019, A.B.'s placement was listed on the meeting summary as "Home Instruction". (SD10-1).

---

[1] The parties submitted their respective motion papers on December 22, 2022.  (*See* Pl. Mem. Summ. J. ("Pl. Mem."), ECF No. 21; Pl. Rule 56.1 Statement ("Pl. 56.1"), ECF No. 22; Pl. Counter Statement to Defs. 56.1 ("Pl. Counter 56.1"); Defs. Response to Pl. 56.1 ("Defs. Resp. 56.1"). ECF No. 25; Defs. Counter Statement to Pls. 56.1 ("Defs. 56.1"), ECF No. 26; Defs. Opp'n to Pls. Mot. ("Defs. Opp."), ECF No. 24; Pl. Mem. in Reply to Def. Opp'n ("Pl. Reply"), ECF No. 28.)  A certified hard copy of the administrative hearing record that was before the State Review Officer (the "Certified Record") was received by the Court by mail on October 18, 2022.  The Certified Record was not e-filed.
[2] For ease of reference, references exhibits prefixed by "SD" refer to the District's exhibits. Hearing testimony is prefixed with "T" and is followed by the witness's last name.

At the September 27 meeting, the CSE also discussed the possibility of A.B. entering an intensive day treatment ("IDT") program pending an out-of-District placement, but such a program was not part of the CSE's formal recommendation. (Defs. Resp. 56.1 ¶ 48(b); SD10-2). The IDT program would not constitute a CSE placement because it does not provide special education. (Pl. 56.1 ¶ 41).

On September 27, 2019, an intake summary was performed at the IDT. A.B.'s parents were present at the intake, along with the District's special educator, a Mr. Williams, and school psychologist, Dr. Lavinia Marchis. (*Id*. ¶¶ 43-44; T-Mazzone, p.172). Yolette Levy and Amanda Allison from IDT were also present for the intake. (Pl. 56.1 ¶ 43). Following the intake, which was signed by Yollette Levy, a plan was set for A.B. to begin attending IDT on October 4, 2019. (SD55-3). A.B. did, in fact, begin attending the IDT on October 4, 2019. (Pl. 56.1 ¶ 42; SRO Decision p.6).

On October 2, 2019, An.S. took A.B. to MAS, where she was informed by the school's principal that A.B. no longer had a placement at the school and could not be left on the premises. (*Id*. ¶ 50). The school administration again advised that IDT was a possible general education alternative interim placement while an out-of-District placement was pending. (Pl. 56.1 ¶ 53). After A.B. was turned away from MAS but on that same day, An.S. received a notice that A.B.'s placement had changed from MAS to home instruction effective as of October 2. (Pl. 56.1 ¶ 49). Even so, A.B. attended the IDT program from October 4, 2019 until November 27, at which point he transferred to the Pocantico Hills Therapeutic Support Program (the "Pocantico Hills Program") with An.S' agreement. (Pl. 56.1 ¶¶ 46, 60).

### b. Due Process Complaints & IHO Decision

On October 8, 2019, the District initiated a due process hearing regarding An.S.' request for multiple independent educational evaluation hearings. (*Id.* ¶ 2). On October 15, 2019, An.S. initiated her own due process hearing wherein she invoked A.B.'s right to "stay put" in his pendency placement in the ICT class at MAS pursuant to N.Y. Educ. L. § 4404(4)(a). (*Id.* ¶ 3). In response, the District initiated an impartial hearing pursuant to 8 N.Y.C.R.R. § 201.8 ("Section 201.8") to demonstrate that returning A.B. to MAS would likely lead to injuries on October 21, 2019. (*Id.* ¶ 4). All three hearings were than consolidated before one IHO. (*Id.* ¶ 5). After A.B.'s transfer to the Pocantico Hills Program, the District withdrew its Section 201.8 hearing request. (SRO Decision p.7, n.5). On March 10, 2021, the IHO issued his decision, finding that the District offered A.B. a free appropriate public education ("FAPE") for the 2017-18 through 2019-20 school years and denied his parents' requests for relief. (Pl. 56.1 ¶ 9; IHO Decision p.46). In particular, the IHO found that the District's removals of A.B. were not disciplinary in nature, but were rather based on safety concerns, and that a manifestation determination review ("MDR") was not required because A.B. had not been withheld from school for greater than ten days in one school year. (Pl. 56.1 ¶ 10; IHO Decision p.38).

### c. SRO Appeal & Decision

An.S. appealed the IHO Decision to an SRO, who issued a decision on May 20, 2021. (Pl. 56.1 ¶¶ 11-12). The SRO found that A.B.'s placement in IDT met the definition of an IAES and, accordingly, the District was required to seek an IHO determination if the District believed maintaining A.B. in his placement prior to the September 27, 2019 CSE meeting was likely to result in injury to A.B. or others. (SRO Decision p.42). The SRO further found that if the District received such a determination, it would then be required to conduct an MDR. (*Id.*).

Moreover, the SRO held that because IDT was informally suggested to A.B.'s parents, it does not qualify as an offer of FAPE. (*Id*.). Accordingly, the SRO reversed the IHO Decision's findings that the District's placement of A.B. in IDT was procedurally and substantively appropriate. (*Id*.) The SRO also ordered the District to provide one hour per day of instruction to A.B. for the number of days he attended the IDT program as an equitable award—thirty-seven hours total. (*Id*. p.50).

## II.     Procedural History

The District filed its complaint on September 10, 2021. (ECF No. 1). After being granted an extension of time to respond (ECF No. 8), the Defendants filed their answer on November 15, 2021. The District's motion for summary judgment was fully submitted, with opposition from the Defendants, on December 22, 2022. (ECF Nos. 20-29).

### LEGAL STANDARDS

## I.     Legal Framework of the IDEA[3]

The IDEA's "purpose is 'to ensure that all children with disabilities have available to them a free appropriate public education.'"  *T.K. v. New York City Dep't of Educ.*, 810 F.3d 869, 875 (2d Cir. 2016) (quoting 20 U.S.C. § 1400(d)(1)(A)).  As the Second Circuit has described, this means "an education 'likely to produce progress, not regression,' and one that 'afford[s] the student with an opportunity greater than mere trivial advancement.'"  *Id.* (quoting *M.O. v. New York City Dep't of Educ.*, 793 F.3d 236, 239 (2d Cir. 2015)); accord *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1001 (2017) ("a student offered an educational

---

[3]  The IDEA was amended by the IDEIA in 2004.  *See E.M. v. New York City Dep't of Educ.*, 758 F.3d 442, 445 n.1 (2d Cir. 2014).

program providing 'merely more than de minimis' progress from year to year can hardly be said to have been offered an education at all").

"The 'centerpiece' of the IDEA and its principal mechanism for achieving this goal is the [Individualized Education Plan ("IEP")]." *T.K.*, 810 F.3d at 875. "The IEP is the means by which special education and related services are 'tailored to the unique needs' of a particular child." *Endrew F.*, 137 S. Ct. at 994 (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 181 (1982)). The IDEA imposes upon school districts the duty to seek out children with a disability and ensure they receive the special education services they need. *See* 20 U.S.C. § 1412(a)(3); 34 C.F.R. § 300.111(a)(1)(i); *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 245 (2009). Similarly, "an educational agency must issue an IEP for a resident qualifying child, even if that child has been enrolled in a private school outside the boundaries of the school district." *Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 451 (2d Cir. 2015). And, the IEP "must be drafted in compliance with a detailed set of procedures." *Endrew F.*, 137 S. Ct. at 994 (citing 20 U.S.C. § 1414(d)(1)(B)).

"The IDEA requires that every IEP include 'a statement of the child's present levels of academic achievement and functional performance,' describe 'how the child's disability affects the child's involvement and progress in the general education curriculum,' and set out 'measurable annual goals, including academic and functional goals,' along with a 'description of how the child's progress toward meeting' those goals will be gauged." *Id.* (quoting 20 U.S.C. §§ 1414(d)(1)(A)(i)(I)–(III)). It "must also describe the 'special education and related services . . . that will be provided' so that the child may 'advance appropriately toward attaining the annual goals' and, when possible, 'be involved in and make progress in the general education curriculum.'" *Id.* (quoting 20 U.S.C. § 1414(d)(1)(A)(i)(IV)).

In addition to providing an education likely to produce progress and tailored to the unique needs of the child, the program must be offered in the least restrictive environment. 20 U.S.C. § 1412 (a)(5)(A); N.Y. Comp. Codes R. & Regs. §§ 200.1(cc), 200.6(a1); see *C.W.L. & E.L. v. Pelham Union Free Sch. Dist.*, 149 F. Supp. 3d 451, 467–68 (S.D.N.Y. 2015) (quoting *M.W. ex rel. S.W. v. New York City Dep't of Educ.*, 725 F.3d 131, 145 (2d Cir. 2013)) (one of the IDEA's goals is "to provide disabled children with a public education 'while protecting them from being inappropriately sequestered in a special-education classroom'"). "[A] disabled student's least restrictive environment refers to the least restrictive educational setting consistent with that student's needs, not the least restrictive setting that the school district chooses to make available." *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 161 (2d Cir. 2014) (emphasis added and citation omitted). "This requirement 'expresses a strong preference for children with disabilities to be educated, to the maximum extent appropriate, together with their non-disabled peers.'" *Id.* (quoting *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998)) (internal quotation marks omitted in original).

"Where the IEP is substantively deficient, parents may unilaterally reject it in favor of sending their child to private school and seek tuition reimbursement from the State." *T.K.*, 810 F.3d at 875. A school district will be required to reimburse parents for expenditures made for a private school placement, if the services offered the student by the school district are inadequate or inappropriate. *See Florence Cty. Sch. Dist. Four v. Carter By & Through Carter*, 510 U.S. 7, 13–16 (1993); *Sch. Comm. of the Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369–70 (1985). Following the *Burlington/Carter* test, once a court determines that a child has been denied an appropriate educational opportunity by the public school district, the remaining considerations are "whether the parents' private placement is appropriate to the child's

needs" and the balance of the equities.  *C.F. ex rel. R.F. v. New York City Dep't of Educ.*, 746 F.3d 68, 73 (2d Cir. 2014).

"Generally, 'the same considerations and criteria that apply in determining whether the School District's placement is appropriate should be considered in determining the appropriateness of the parents' placement'; accordingly, the private placement must be 'reasonably calculated to enable the child to receive educational benefits.'"  *Doe*, 790 F.3d at 451 (citation omitted).  "Under New York law, 'the [school district] bears the burden of establishing the validity of the IEP, while the parents bear the burden of establishing the appropriateness of the private placement.'"  *T.K.*, 810 F.3d at 875 (quoting *C.F.*, 746 F.3d at 76 (citing N.Y. Educ. Law § 4404(1)(c))).[4]

## DISCUSSION

The District seeks an order from the Court that would deny enforcement and reverse the SRO Decision to the extent that it held A.B. was improperly removed to the IDT program and the award of thirty-seven hours of compensatory education. (*See* Compl. ¶¶ 44-45; *see also* Pl. Mem. pp.1-2, 13).

## I.    Standard of Review

In IDEA actions, district courts follow a procedure that is in substance an appeal from an administrative determination, not a traditional summary judgment analysis.  See *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005).  Thus, the usual summary judgment considerations, of whether material factual disputes exist, are not employed; rather, the court "must engage in an independent review of the administrative record and make a

---

[4] "It remains an open question whether states may deviate from the IDEA's default rule, as New York does, by placing the initial burden on the school board."  *Reyes ex rel. R.P. v. N.Y. City Dep't of Educ.*, 760 F.3d 211, 219 (2d Cir. 2014) (citing *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57–58 (2005)) ("the Supreme Court has interpreted the statute to place the burden of challenging an IEP on the party bringing the challenge").

determination based upon a preponderance of the evidence[.]" *Hardison v. Bd. Of Educ. Of the Oneonta City Sch. Dist.*, 773 F.3d 372, 385–86 (2d Cir. 2014) (internal quotations and citations omitted). That independent review, however, is not without significant limitations. "The role of the federal courts in reviewing state education decisions under the IDEA is circumscribed." *C.F.*, 746 F.3d at 77. The standard of review "requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete de novo review." *Id.* at 77 (*quoting M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 244 (2d Cir. 2012)). The SRO has special expertise in educational matters involving the IDEA and its decisions, when "thorough and well-reasoned," are entitled to deference. *T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 419 (2d Cir. 2009).

Under this deferential review, "[w]here the IHO and SRO disagree," a federal court will "defer to the reasoned conclusions of the SRO as the final state administrative determination." *C.F.*, 746 F.3d at 77 (citation omitted). "However, where the SRO's determinations are insufficiently reasoned to merit deference," or when "considering an issue not reached by the SRO," the reviewing court "should defer to the IHO's analysis." *Id.* (citation omitted). "District courts are not to make subjective credibility assessments and cannot choose between the views of conflicting experts on controversial issues of educational policy in direct contradiction of the opinions of state administrative officers who had heard the same evidence." *M.H.*, 685 F.3d at 240 (alterations and internal quotation marks omitted) (citing *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 383 (2d Cir. 2003)).

Different types of findings are also accorded different degrees of deference. For instance, the SRO's findings regarding the IEP's substantive adequacy command more deference than determinations regarding whether the IEP was developed according to proper IDEA procedures.

*See M.H.*, 685 F.3d at 246; see also *M.P. v. Carmel Cent. Sch. Dist.*, No. 15 CV 3432 (VB), 2016 WL 379765, at *4 (S.D.N.Y. Jan. 29, 2016) ("Courts should afford more weight to SRO determinations when they involve the substantive adequacy of an IEP.").  Determinations of appropriate methodology are accorded greater deference, while factual determinations of progress are afforded less.  See *M.H.*, 685 F.3d at 246.  More deference is due when this Court's determination rests solely on the same evidence presented to the SRO.  *Id.*

Deference is not due to the SRO involving matters outside their area of expertise, "such as contract interpretation or the requirements of standing[;]" that is, with respect to questions of law or legal interpretation. *E.M.*, 758 F.3d at 456-57. Courts are in just as strong a position—if not stronger—to make legal conclusions as an SRO and, accordingly, such legal conclusions are not afforded deference but are reviewed *de novo. See Lillbask ex rel. Mauclaire,* 397 F.3d at 82; *Muller on Behalf of Muller v. Committee on Special Educ. Of East Islip Union Free School Dist.*, 145 F.3d 95, 102 (2d Cir. 1998).

It is with all these standards in mind, and having considered the parties' positions on deference, that the Court approaches the findings, reasoning, and persuasiveness of the SRO's decision as to each of the issues below.

## II.   IDEA Claim

The District seeks review of the SRO's conclusions that: (1) A.B. was improperly removed to the IDT program and (2) the award of thirty-seven hours of compensatory education based on that improper removal. (Compl. ¶¶ 44-55; Pl. Mem. p.13). Generally, the District argues that the SRO made errors of both fact and law in holding that A.B. was placed in an IAES and that, therefore, the District was required to conduct an MDR. (Pl. Mem. pp.8-13).

### a. "Disciplinary Change in Placement" & "Interim Alternative Education Setting"

At the outset, the SRO and IHO diverged in deciding whether A.B.'s removal from MAS constituted a "Disciplinary change in placement" (a "DCP") within the meaning of 8 N.Y.C.R.R. § 201.2(e) or an IAES, as defined in 8 N.Y.C.R.R. § 201.2(k). After recounting the relevant facts and statutes, the SRO makes the conclusory statement that "IDT met the definition of an IAES . . . ." (*Id.* p.38-42). At the outset, the SRO noted that "[r]elevant to [the] review of the [germane] events . . . are the procedures under the IDEA by which school officials may effect a disciplinary change in placement . . . ." (*Id.* p. 38).

The IHO, on the other hand, was express that A.B.'s removal was not disciplinary in nature. (*See* IHO Decision pp.37-38). Given this issue is one of statutory interpretation, the Court reviews it fully *de novo*. *See Muller on Behalf of Muller*, 145 F.3d at 102 (2d Cir. 1998) (holding that District Courts are "free to consider . . . issue[s] of . . . statutory [interpretation] *de novo*)).

A "disciplinary change in placement" occurs when a student is "suspen[ded] or remov[ed] from a student's current education placement [for] either: (1) . . . more than 10 consecutive school days;" or (2) after repeated suspensions or removals resulting from substantially similar conduct constituting a pattern that amount for greater than ten school days in a school year. 8 N.Y.C.R.R. § 201.2(e). An IAES is a "temporary educational placement, other than the student's current placement at the time the behavior precipitating the IAES placement occurred." 8 N.Y.C.R.R. § 201.2(k).

The Court disagrees that A.B.'s enrollment in IDT constituted either a DCP or an IAES.

It is undisputed that between September 6 and October 1, 2019, A.B. was suspended for a total of seven-and-one-half days. (Resp. 56.1 ¶ 35). It is further undisputed that at the September

27, 2019 CSE meeting, the CSE recommended that A.B.'s placement be changed to four hours of home instruction per day pending a search for an out-of-District day program and that the IDT program, to the extent discussed, did *not* constitute a CSE placement. (*Id*. ¶¶ 38, 41(b)). Moreover, the parties agree that A.B.'s parents received a prior written notice of the change in placement to home instruction effective on October 2, 2019. (*Id*. ¶ 49). That, as far as the District was concerned, A.B.'s placement was changed from MAS to home instruction is also independently supported by the record. (*See* SD10-1 ("Placement: Home Instruction"); SD36-1 ("[A]t its September 27, 2019 meeting, [the CSE] recommended that a search be conducted for an appropriate out-of-district placement and that, in the interim, [A.B.] be placed on home instruction effective October 2, 2019 . . . [t]his is [A.B.'s] current placement . . . "); *see also* T-An.S. p.1594 ("We were waiting to get prior written notice of the change in placement to home instruction . . .); T-McKean p.1011 ("Q. Where was [A.B.] to receive his educational services while [the search for an out-of-district placement] was being conducted?  A. Home instruction").

The parties do dispute, however, the degree of choice A.B.'s parents had with respect to his admission into the IDT program. The District argues that the parents had the option to voluntarily place A.B. in IDT and eventually did so. (*See* Pl. 56.1 ¶¶ 1, 40-42). A.B.'s parents counter that they essentially had no choice. The record substantially supports that home instruction was not practically viable for An.S. given her work schedule.[5] (SRO Decision p. 41-42; IHO Decision p.40; T-An.S. p.1777) As a result, An.S. enrolled A.B. in IDT because "she felt she did not have another option." (SRO Decision p.42).

Impracticalities do not, however, change A.B.'s enrollment in IDT into a placement that may be challenged under the IDEA. While the difficulties and hardships associated with childcare

---

[5] It is also undisputed by the parties that when An.S. brought A.B. to school on October 2, 2019, MAS officials made it clear that A.B. had no placement at the school and could not be left there. (Pl. 56.1 ¶ 50).

are not to be diminished, An.S. is mistaken in thinking she did "not have another option [. . .]" on October 2, 2019 when A.B. was barred from attending MAS. An.S. actually had three options: (1) permit home instruction; (2) choose to take A.B. to IDT; and (3) invoke the "stay-put" provision under N.Y. Educ. L. § 4404(4)(a) to keep A.B. in MAS as she challenged, importantly, the District's change of placement to *home instruction*. In fact, An.S. *did* initiate a due process hearing such that A.B.'s pendency placement would remain at MAS (Pl. 56.1¶ 3).[6] Moreover, the SRO noted that A.B.'s parents argued, with respect to their pendency challenge, that his "'operative placement' was at the district's school not the IDT program[,]" revealing, by implication, the parents' challenged placement was *home instruction* and sought to return A.B. to his prior placement at MAS. (SRO Decision p.5). Therefore, from a legal perspective: (1) the District had changed A.B.'s placement to home instruction, which (2) A.B.'s parents challenged and sought pendency at MAS. With respect to IDT, then, there is no basis for the parents to challenge his attendance under the IDEA.

The SRO is correct that a school district may not unilaterally remove a student with a disability from a placement if the district believes the student to be a safety risk. (SRO Decision p.42); *see also Honig v. Doe*, 484 U.S. 305, 321 (1988). The propriety of the District's change of placement to home instruction is not, however, before the Court.[7] With respect to A.B.'s placement in IDT the District did not act unilaterally. IDT was not the CSE's formal recommendation, nor

---

[6] In response, the District initiated a safety hearing to prevent A.B.'s return to MAS, (PL. 56.1 ¶ 4), only to drop this challenge once once A.B. was placed in the Pocantico Hills Program. (SRO Decision p.7, n.5)

[7] The Court does note that District appeared to be operating under the assumption that home instruction placement was a DCP. For one and as noted above, it invoked 8 N.Y.C.R.R. § 201.8(a) ("Section 201.8(a)") to hold a safety hearing that, despite A.B.'s invocation of the "stay-put" provision, would still remove him from his former placement at AMS. (Pl. 56.1 ¶¶ 3-4). Section 201.8(a) gives an IHO the power to place a student with a disability into an IAES for no greater than 45 days if the student maintaining their current placement is substantially likely to result in injury to the student or others. 8 N.Y.C.R.R. § 201(8)(a). Moreover, had An.S. had opted for home instruction, the facts indicate that A.B. would have been "remov[ed] from [his] current educational placement . . . for more than 10 consecutive school days[,]" giving rise to a DCP, because he did not start at the Pocantico Hills Program until November 27, 2019. 8 N.Y.C.R.R. § 201.2(e); (Pl. 56.1 ¶ 60).

was it A.B.'s official change of placement. Although An.S. had misgivings about the program (*see* T-An.S. p. 1779), she chose to take A.B. to IDT because of practical concerns. In essence, IDT became an agreed-upon placement between the District and An.S. pending the resolution of the various proceedings that were then-ongoing and not, as the SRO held, an IAES triggering procedural protections under the IDEA. (SRO Decision p.42).

This conclusion is bolstered when reviewing the purposes of the IDEA and the pertinent elements of an adequate an IEP. The IDEA guarantees all children with disabilities a FAPE. *T.K.*, 810 F.3d at 875 (2d Cir. 2016). A FAPE must produce progress beyond that of "trivial advancement." *Id.* (quoting *M.O.*, 793 F.3d at 239 (2d Cir. 2015)). An IEP must be "'tailored to the unique needs' of a particular child." *Endrew F.*, 137 S. Ct. at 994 (cleaned up) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 181 (1982)). An IEP "must also describe the 'special education and related services . . . that will be provided' so that the child may 'advance appropriately toward attaining the annual goals' and, when possible, 'be involved in and make progress in the general education curriculum.'" *Id.* (quoting 20 U.S.C. § 1414(d)(1)(A)(i)(IV)). Nowhere in the IDEA's mandates is a school required to accommodate any and all impracticalities that may result from a particular child's IEP for that child's parent. Rather, the focus is squarely on the particular child and crafting an individualized IEP in response to that child's disabilities. Parents are not without recourse, however, as there are avenues to challenge the IEP and the child's placement. *See e.g.* N.Y. Educ. L. § 4404(4)(a). As previously demonstrated, that placement was home instruction, not IDT.

Accordingly, the SRO's holding that A.B.'s enrollment in IDT constituted an IAES is REVERSED and her consequent award of thirty-seven hours of compensatory education is similarly REVERSED.

**CONCLUSION**

For the foregoing reasons, Plaintiff's motion for summary judgment is GRANTED. The

Clerk of Court is respectfully directed to terminate this action.


Dated:    March 31, 2024                                   SO ORDERED:
          White Plains, New York

                                                  _____
                                                        NELSON S. ROMÁN
                                                    United States District Judge